Mr. and Mrs. Andrew Stephen FARACA, Plaintiffs-Appellees,

v.

Dr. James D. CLEMENTS, Individually, et al., Defendants-Appellants.

No. 74–1526.

United States Court of Appeals, Fifth Circuit.

Jan. 17, 1975.

Arthur K. Bolton, Atty. Gen., Robt. S. Bomar, Carl C. Jones, Asst. Attys. Gen., Atlanta, Ga., for defendants-appellants.

Fred L. Cavalli, Roy A. Adilman, Atlanta, Ga., for plaintiffs-appellees.

Before MORGAN and CLARK, Circuit Judges, and RUBIN, District Judge.

CLARK, Circuit Judge:

This is a suit for injunctive and monetary relief for racial discrimination which interfered with the right to contract for employment in violation of 42 U.S.C. § 1981.[1] Plaintiffs, Andrew Faraca, a Caucasian, and his wife, Ophelia, a black, brought this action against Dr. James D. Clements, the Director of the Georgia Retardation Center, individually, and against the Georgia Retardation Center (Center), requesting an order enjoining the defendants from engaging in discriminatory employment practices and seeking general, special and punitive damages, attorneys' fees and costs. The trial court, sitting without a jury, found that Dr. Clements' actions in refusing to hire Mr. Faraca were racially discriminatory, and assessed damages in the amount of 7,188.75 dollars against Dr. Clements personally. The court refused to assess damages against the Center.[2] This award represented the difference between Mr. Faraca's earnings as a teacher and the sum he would have earned if he had been employed by the Center in the position he sought.[3] The

trial court, however, denied the requested injunctive relief, based upon plaintiffs' failure to prove a policy, custom, or usage of racial discrimination by either defendant. The court further refused to award punitive damages, finding that there was no malice and that Dr. Clements had no prior specific knowledge of the impropriety of his actions. Finally, the trial court denied the plaintiffs' prayer for attorneys' fees. Appellees did not cross appeal. We affirm.

The following facts found by the trial court are amply supported by the record. The Center was conceived by the Georgia General Assembly in 1964 as a research and treatment center, and began operation in 1969 with facilities in Atlanta and Athens. Dr. Clements was appointed as the Center's first superintendent and is largely responsible for its success.

The combined Atlanta and Athens units house 550 resident retarded children and treat an additional 200 outpatients. Of these 750 children, 90% are classed as severely retarded, 9% as trainable, and only 1% as educable. The Center is thoroughly integrated by race and has been since inception, both as to patients and staff. Fifty percent of the staff members in the Division of Community Living are black, 31% of the entire Center staff is black and two-thirds of that 31% are employed at the administrative level.

Employment with the Center during 1971, the year in which the Faracas applied, was effected by obtaining approval of the appropriate supervisor and then going through the Personnel Director who formalized the employment. As a

---

1. Section 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

2. The district court ruled that as a State agency, the Center could not be subjected to monetary liability. *See*, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

3. The district court concluded that Mrs. Faraca's negotiations had not ripened to such a point as to evince employment discrimination on the basis of race and consequently refused to award her damages.

state facility, the Center's acceptance of an applicant is subject to certification by the State Merit Board; but, because it was a new facility, a person accepted for employment by the Center in 1971 was certified and approved by the Merit Board virtually as a matter of course.

In July of 1971 the Faracas filled out employment applications with the Center. Mr. Faraca specifically sought employment as a Cottage Program Specialist,[4] while Mrs. Faraca made an "open" application, hopeful that she and her husband could both obtain employment with the Center. A Center employee who initially interviewed Mr. Faraca for the Specialist position suggested that, in light of Faraca's impressive credentials,[5] Faraca apply for the post of Cottage Program Administrator.[6] Each Cottage Program Administrator is required to live in an adjacent apartment with his spouse and both are responsible 24 hours a day for the Cottage's operation and for the welfare of the children as "surrogate parents".

The following day Mr. Faraca met with a Dr. Mills, the Director of Community Living, who was responsible for interviewing Cottage Administrator applicants. Dr. Mills stated during trial that he considered Faraca the best-qualified applicant he had interviewed, and that he was satisfied that Faraca should have been immediately hired. After so satisfying himself, all that remained was for Mills to route the application to Personnel for certification. Upon these facts, the trial court concluded that there was no doubt that, considering Faraca's qualifications, his application would have been routinely granted and that nothing remained for him to do to perfect his application and employment.

After determining the desirability of employing Mr. Faraca, Dr. Mills, rather than sending the application directly to Personnel, notified Dr. Clements of his intent to hire Mr. Faraca.[7] Clements, voicing grave concern about the effects of the racially mixed couple on visitors and possible adverse reactions from state legislators, instructed Mills not to hire Faraca for the position of Cottage Administrator. Dr. Clements did, however, authorize Mills to offer Faraca employment as a Cottage Specialist. Faraca no longer desired that post.

On appeal, Dr. Clements first contends that Section 1981 was only intended to proscribe a breach of contract, not, as in this case, the refusal to enter into a contract. We disagree. The statute expressly equalizes the right of all citizens "*to make* and enforce contracts". By specifically protecting the right to make contracts Congress must have meant to protect black citizens from racially based interference with prospective contract rights, otherwise the words italicized would be redundant. In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 442, 88 S.Ct. 2186, 2204, 20 L.Ed.2d 1189 (1968) at fn. 78, the Supreme Court stated that "the right to contract for employment [is] a right secured by 42 U.S.C. § 1981". If Section 1981 did not afford protection prior to execution, the remedy it sought to create could be thwarted in many instances by the expedient of refusing to contract with blacks. Decisions from other jurisdictions are in conformity with today's holding. *E. g.*, Waters v. Wisconsin Steel Works of Internat'l Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Scott v. Young, 307 F.Supp. 1005 (E.D.Va.1969),

---

**4.** The Center utilizes a "cottage system" in which the Center's resident population is divided into units, each of which is housed and trained separately.

**5.** Mr. Faraca has nine years of college training and holds two degrees with additional certificates in child training. His wife also has a college degree and has done post-graduate work. At the time of the incident at issue, both plaintiffs had teaching experience.

**6.** The Cottage Program Administrator heads a cottage unit and supervises three shifts of Cottage Specialists and assistants.

**7.** Dr. Clements had directed Mills to notify him regarding any application which Mills considered controversial.

aff'd, 421 F.2d 143, cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *see* Valle v. Stengel, 176 F.2d 697 (3d Cir. 1949); Gonzales v. Fairfax-Brewster-School Inc., 363 F.Supp. 1200 (E.D. Va.1973).

■ Technically, the State of Georgia was the prospective employer and only it would be in a position to refuse to enter into a contract. If Dr. Clements is subject to liability under Section 1981 such liability must be assessable for *interfering* with the right to contract. Although the present action against Dr. Clements was not denominated as one for tortious interference with the making of a contract, this lack of formality is not fatal since the basic right to relief has been declared to exist. The courts in their broad interpretation of Section 1981 and 1982 (both of these statutes are derived from Section 1 of the Civil Rights Act of 1866, 14 Stat. 27) have held that a third party's interference with those rights guaranteed under Sections 1981 and 1982 will subject such a person to personal liability. *E. g.*, Hernandez v. Erlenbusch, 368 F.Supp. 752 (D.Or.1973); Bennett v. Gravelle, 323 F.Supp. 203 (D. Maryland), aff'd, 451 F.2d 1011 (4th Cir. 1971), cert. denied, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972); Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969). The Supreme Court's ruling in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) is controlling on this point. That action concerned the appropriateness of a claim under Section 1982 which asserted an interference with the equal right to lease. The court stated:

> The right to "lease" is protected by § 1982 against the actions of third parties, as well as against the actions of the immediate lessor. Respondents' [Swimming Club Association] actions in refusing to approve the assignment of the membership share in this case was clearly an interference with [petitioner's] right to "lease." A narrow construction of the language of § 1982

would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, 14 Stat. 27, from which § 1982 was derived.

*See also* Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). It would be logically inconsistent not to apply the *Sullivan* interpretation with equal force to a suit for interference with the right to contract guaranteed by Section 1981 since, as mentioned previously, it is also derived from Section 1 of the Civil Rights Act of 1866 and thus should enjoy the same broad interpretation of its breadth of coverage. Grier v. Specialized Skills, Inc., 326 F.Supp. 856, 860 (W.D.N.C.1971). *See* Jones v. Alfred H. Mayer Co., *supra*; Young v. International Tel. & Tel. Co., 438 F.2d 757 (3d Cir. 1971); Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Scott v. Young, *supra*.

■ Dr. Clements further contends that compensatory damages may not be imposed upon a claim for relief under Section 1981. However, the propriety of such an award in a Section 1981 action is well recognized in this circuit. *E. g.*, Sanders v. Dobbs Houses, *supra*; Mizell v. North Broward Hospital Dist., 427 F.2d 468 (5th Cir. 1970). *See also* Sullivan v. Little Hunting Park, Inc., *supra*, 396 U.S. at 239, 90 S.Ct. at 405, in which the Supreme Court stated, "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies;" and Waters v. Wisconsin Steel Works of Internat'l Harvester Co., *supra*, 427 F.2d at 488, in which the Seventh Circuit stated that a plaintiff's relief under Section 1981 "is potentially as broad as that available in [an] action . . . under Title VII."

The damages awarded in this case, 7,188.75 dollars, represent the difference between what Mr. Faraca would have

**960**

made as a Cottage Administrator and what he actually did make during the period in question. Given the fact that the loss was caused by a statutory violation on Dr. Clements' part, the remedy is necessary, appropriate and a reasonable form of relief. *See* Smith v. Board of Education, 365 F.2d 770 (8th Cir. 1966).

 Finally, Dr. Clements asserts that even if damages are normally proper in Section 1981 actions they should not be awarded against him personally in this case since he proceeded on the basis of a good faith concern for the program he was administering as to the consequences which would flow from employing Mr. Faraca in the capacity of Cottage Administrator and not out of any personal bias or prejudice. Such considerations may be found persuasive in considering the right of Dr. Clements to seek reimbursement from his employer, however they are irrelevant to a determination of the right to and appropriateness of relief available to Mr. Faraca as compensation for the loss of this employment opportunity. A brief recurrence to school desegregation precedents reminds us that a public official cannot find sanctuary from the consequences of an act of racial discrimination in a fear that public reaction will bring unfavorable results. *E. g.*, Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1968); Bell v. West Point Municipal Separate School Dist., 446 F.2d 1362 (5th Cir. 1971). The district court correctly distinguished Dr. Clements' knowing failure to obey the law in a good faith fear of the consequences which could ensue, from the situation of a public official who violates a citizen's rights in executing his duties in a way that he in good faith believes the law to require. While the latter may constitute a legitimate defense to a claim by an injured party, *e. g.*, Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the former does not.

The judgment appealed from is

Affirmed.