[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14719
_____

D.C. Docket No. 1:13-cv-03534-ODE


RONALD E. MOORE, JR.,

Plaintiff - Appellant,

versus

GRADY MEMORIAL HOSPITAL CORPORATION,
FULTON-DEKALB HOSPITAL AUTHORITY,
d.b.a. Grady Health System,
KENNETH J. CARNEY, M.D.,
RAPHEL GERSHON, M.D.,
KELVIN J. HOLLOWAY, M.D., et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 19, 2016)

Before JORDAN and ANDERSON, Circuit Judges, and DALTON,[*] District Judge.

JORDAN, Circuit Judge:

Dr. Ronald E. Moore, Jr. appeals the district court's dismissal of his claims for race discrimination and retaliation in violation of 42 U.S.C. § 1981. Exercising plenary review, *see Shands Teaching Hospital & Clinics, Inc. v. Beech Street Corp.*, 208 F.3d 1308, 1310 (11th Cir. 2000), and with the benefit of oral argument, we affirm in part and reverse in part.

## I

The complaint alleged the following facts.

## A

Dr. Moore, an African-American male, is a licensed, board-certified general surgeon and a specialist in laparoscopic and advanced robotic surgery. Sometime in 2011, Morehouse School of Medicine recruited him to be part of its faculty.

Prior to his appointment to the MSM faculty, Dr. Moore was required to obtain clinical privileges at Grady Memorial Hospital. Dr. Moore applied for privileges at Grady in August of 2012, and was granted them the following month. Dr. Moore sought privileges to perform various laparoscopic procedures, including several that are considered to be "foregut surgeries" that Dr. Moore performed to

---

[*] The Honorable Roy B. Dalton, United States District Judge for the Middle District of Florida, sitting by designation.

2

treat reflux disease or to repair hiatal hernias.  Grady's standard application for surgical privileges "does not contain the type of special surgical procedures [for which] Dr. Moore sought privileges."  D.E. 1 at ¶ 19.  Nevertheless, "Grady never informed Dr. Moore, either in writing or verbally, that there were any deviations from the clinical privileges granted," and "no one ever instructed Dr. Moore to refrain from any types of surgeries or imposed any limitations to the clinical privileges granted to him."  *Id.* at ¶ 28.

In October of 2012, Dr. Moore entered into an employment agreement with MSM for a position as an assistant professor in the Department of Surgery.  In January of 2013, Grady entered into an affiliation agreement with MSM.  The agreement recognized that "the mission of MSM at Grady is to educate medical students, train physicians, operate a faculty group medical practice, conduct medical research and engage in efforts to improve healthcare for sick and injured individuals."  *Id.* at ¶ 29.  The affiliation agreement outlined how MSM and its faculty would provide clinical services to Grady.  It also set out the faculty's teaching responsibilities.

Grady receives approximately $750 million from Fulton County and DeKalb County, as well as other government and private sources, to sustain a clinical practice.  This money is then divided between Emory University's School of Medicine and MSM based on the clinical services these entities provide to Grady.

Grady also refers uninsured or underinsured patients to outside physicians and compensates those physicians for procedures as "fee for services." Decisions about when and where to send patients is controlled by Dr. Curtis Lewis, Grady's Chief Medical Officer and Executive Vice President.

## B

In late April of 2013, Timothy Jefferson, Grady's General Counsel, approached Dr. Derrick Beech, Associate Dean at MSM, regarding several surgical procedures performed by Dr. Moore. Grady was not compensated for these surgeries because they were coded as bariatric procedures, i.e., procedures to achieve weight loss, which were unauthorized because, according to a summary suspension letter later received by Dr. Moore, Grady has no program in place to support bariatric/weight loss surgeries for its patients. *See* D.E. 18-1.[1]

Dr. Beech agreed to review the procedures performed by Dr. Moore. With the exception of one case, Dr. Beech did not believe that Dr. Moore's surgeries were bariatric. Grady decided to have the cases examined by an outside reviewer. In the meantime, the parties agreed that Dr. Moore would not perform gastric bypass surgery, but that he could continue to perform sleeve gastrectomy for

---

[1] According to the complaint, "gastric resection surgeries could be viewed as bariatric if other medical concerns are not present." D.E. 1 at ¶ 35. But "[b]ariatric procedures consistent with the standard of care of obese patients and cosmetic weight loss procedures are not the same." *Id.* at ¶ 39.

patients with morbid obesity and a clear diagnosis of gastroesophageal reflux disease.

In June of 2013, Dr. Moore met with Dr. Roseanne Pena—the acting Director of the Operating Room at Grady—and another physician, and expressed his concern that the Emory doctors were being given greater access to the operating rooms at Grady as compared to the MSM doctors. For example, even where the doctors from the two schools had the same number of cases, if there were 18 operating rooms, the MSM doctors would be allotted two, and the Emory doctors would be given 16.

## C

Dr. Moore received a letter from Dr. Lewis on July 1, 2013, informing him that his membership on Grady's medical staff was summarily suspended due to his continued performance of unauthorized surgical bariatric/weight loss procedures. According to the letter, Dr. Moore had been advised on several occasions that such procedures were not authorized at Grady and told to cease performing them. The letter apprised Dr. Moore that his procedures were being reviewed externally and that he would be given a hearing and appeal rights in accordance with Grady's medical staff bylaws.

A July 5, 2013, letter from Dr. Kevin Holloway—the Deputy Senior Vice President for Medical Affairs at Grady and an associate professor at MSM—

confirmed that the basis for Dr. Moore's summary suspension was the unauthorized surgical bariatric/weight loss procedures, and outlined the steps that would follow in the Medical Executive Committee's review of the suspension. According to the complaint, Dr. Moore never discussed ceasing bariatric procedures with anyone at Grady or MSM prior to the specific surgeries referenced in Dr. Holloway's July 5 letter.

Dr. Moore was invited to address the MEC when it met, but was not permitted to be in the room while Dr. Lewis spoke to the MEC. Dr. Lewis presented a much broader basis for Dr. Moore's suspension than had been communicated in the July 1 and July 5 letters, and introduced the results of the external review of Dr. Moore's procedures, which had not been shared with Dr. Moore. By the time Dr. Moore entered the room, "the MEC had clearly decided his fate." D.E. 1 at ¶ 54. Further, "during the deliberation process, one or two [MEC] members . . . made disparaging and unprofessional comments, which evidence[d] racial animus and malice." *Id*.

The MEC decided to continue the suspension of Dr. Moore's privileges. Because Dr. Moore refused to resign his privileges at Grady's urging, one or more of its physicians filed complaints against him with the Composite State Medical Board.

In October of 2013, Dr. Moore sued Grady, the Fulton-Dekalb Hospital Authority d/b/a Grady Health System, and several individual physicians at Grady (individually and in their capacities as members of the MEC).  He alleged violations of 42 U.S.C. § 1981 (Counts I & II); 42 U.S.C. § 1983 (Count III); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Count IV); and 42 U.S.C. § 1986 (Count V).  Dr. Moore also asserted two state-law claims, one for violations of hospital bylaws (Count VI), and the other for intentional infliction of emotional distress (Count VII).  The district court granted the defendants' Rule 12(b)(6) motion to dismiss the federal claims and declined to exercise jurisdiction over the state-law claims.  Dr. Moore's appeal concerns only the § 1981 claims asserted in Counts I and II.

## II

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

## III

"Among the many statutes that combat racial discrimination, § 1981 . . . has a specific function: It protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (quoting § 1981(a)).  The phrase "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

Dr. Moore pursues two theories of liability under § 1981: discrimination by Grady, the Hospital Authority, and the individual Grady physicians (Count I); and retaliation by Grady and the Hospital Authority (Count II).  We address each theory in turn.

## A

"To state a claim of race discrimination under § 1981, [a] plaintiff[ ] must allege facts establishing: (1) that [he] is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute."  *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1270 (11th Cir. 2004) (citation and footnote omitted).

It is undisputed that the complaint satisfied the first two elements. Dr. Moore is a member of a racial minority, and, accepting his allegations as true, the defendants do not challenge the claim that they intentionally discriminated against him because of his race by, "among other things, diverting cases to white physicians outside of Grady Hospital, failing to provide operating rooms to the African American doctors to perform surgery, and by summarily suspending him under false pretext for discrimination." D.E. 1 at ¶ 77.

The parties' dispute centers on the third element. "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza*, 546 U.S. at 476 (footnote call number omitted). Dr. Moore relies on two different contracts to support his § 1981 claim: his employment contract with MSM, and the affiliation agreement between Grady and MSM.

**1**

The first contractual relationship on which Dr. Moore premises his § 1981 claim is his employment contract with MSM. *See* D.E. 1 at ¶ 78 ("The discriminating actions of the Defendants impaired Dr. Moore's agreement with Morehouse School of Medicine . . . ."). The defendants do not dispute that this agreement satisfies the "contractual relationship" requirement of § 1981. Indeed, as the district court held, "§ 1981 allows [Dr. Moore] to state a claim against Grady

9

for interference with existing contractual rights with MSM (a third party)." D.E. 44 at 15–16. And at oral argument, the defendants agreed that § 1981 provides a remedy for a physician who has a contract with a third party if that contract is impaired as a result of the suspension, revocation, or adjustment of his privileges at the hospital, as long as the physician sufficiently alleges that the cause of that impairment is racial animus. The defendants contend, however, that Dr. Moore's allegations are conclusory. We disagree.

Because Dr. Moore bases his § 1981 claim on his contract with MSM, our opinion in *Jimenez v. WellStar Health System*, 596 F.3d 1304 (11th Cir. 2010), does not control. *Jimenez* involved a physician in Georgia who—like Dr. Moore— believed that the suspension of his medical staff privileges was racially motivated. The physician brought a § 1981 claim against the administrators, physicians, and hospitals associated with WellStar Health System. Significantly, however, the *Jimenez* physician did not have an actual employment contract with a third party that was impaired by the defendants' alleged discriminatory acts. Instead, one of the contractual theories pursued by the *Jimenez* physician was that the suspension of his privileges violated an "implicit contract" that he had with WellStar, whereby WellStar agreed to grant him privileges and he agreed to treat patients at WellStar's hospitals. *Id.* at 1309. "Under such a theory, the staff privileges . . . serve[d] as the consideration for the contract; they [did] not themselves create the

10

contract." *Id.* The revocation of his privileges, the *Jimenez* physician argued, amounted to a breach of contract by WellStar, and because the revocation was for allegedly discriminatory purposes, it violated § 1981. *See id.*

We rejected this implied contract theory, concluding that WellStar's policies made clear that medical staff privileges did not confer any contractual rights upon a physician, and that "Georgia law agree[d]." *Id.* We ruled that, "[u]nder Georgia law, medical staff bylaws, which govern medical staff privileges, do not create a contractual right to the continuation of those privileges." *Id.* (footnote and citations omitted). Furthermore, "under Georgia law, alleging suspension of medical staff privileges does not implicate any contractual relationship, and, as such, cannot be the basis of § 1981 discrimination claim." *Id.* at 1310.

But here Dr. Moore is not arguing that his medical privileges constitute a contract with Grady. Nor does he claim that they are the consideration for a contract with Grady. Dr. Moore instead bases his § 1981 claim on an employment contract he had with a third party, MSM, and is alleging that the suspension of his medical privileges by Grady is but one of the discriminatory acts performed by the defendants that interfered with his performance of his contract with MSM. On the facts alleged in the complaint, there is no concern that Dr. Moore is "circumvent[ing] Georgia's clear rule that medical staff privileges cannot create

11

contractual liability." *Id.* Accordingly, we find that nothing in *Jimenez* precludes Dr. Moore's § 1981 discrimination claim.

Despite recognizing that Dr. Moore's contract with MSM constituted a proper basis for the § 1981 claim, and made Dr. Moore's case distinct from *Jimenez*, the district court dismissed the § 1981 discrimination claim. The district court relied on an unpublished Eleventh Circuit opinion, *Williams v. Columbus Regional Healthcare Systems, Inc.*, 499 F. App'x 928 (11th Cir. 2012), and, more specifically, the underlying opinion from the district court in that case, *Williams v. Columbus Regional Healthcare Systems, Inc.*, No. 4:11-CV-28 (CDL), 2012 WL 315482 (M.D. Ga. Feb. 1, 2012). That reliance was understandable, but misplaced.

*Williams* involved a situation, like Dr. Moore's, where the physician had an actual employment contract with a third party that was allegedly being impaired by the defendant's discriminatory actions. The district court ruled that "each of [the physician's] claims has as an essential factual predicate the termination of his hospital privileges," 2012 WL 315482 at *5, and, purportedly applying *Jimenez*, held that "to survive a motion to dismiss, [the physician's] claim against [the defendant] must be based on conduct by [the defendant] that caused the Columbus Clinic [the third party] to terminate him *unrelated to the loss of his hospital privileges*." *Id.* at *6 (emphasis added). The district court found the phsyician's remaining factual allegations, concerning how defendant interfered with his

12

employment contract, too vague and conclusory "'to raise a right to relief above the speculative level.'"  *Id.* at \*7 (quoting *Twombly*, 550 U.S. at 555).  A panel of this Court affirmed the result in a brief opinion that did not appear to consider the actual employment contract that distinguished the case from *Jimenez*.  *See Williams*, 499 F. App'x at 929–30.

The district court here, with some hesitation, followed *Williams* and essentially ignored all of the factual allegations in the complaint relating to the suspension of Dr. Moore's privileges.  Focusing only on the remaining discriminatory practices alleged by Dr. Moore—the assignment of operating rooms and patient referrals—the district court concluded that Dr. Moore had failed to sufficiently plead how the defendants' conduct impaired his contract with MSM.  *See* D.E. 44 at 17 ("On the face of the Complaint, it is unclear that these practices, *absent the suspension of [Dr. Moore's] medical privileges*, had any effect on his employment contract with MSM.") (emphasis added).  To the extent either opinion in *Williams* (the district court order or the non-binding Eleventh Circuit opinion) can be read to suggest that Dr. Moore cannot rely, as part of his § 1981 claim, on a claim that the suspension of his medical privileges was a discriminatory act that interfered with his contract with MSM, we reject that view as an improper and unwarranted application of *Jimenez*.

Dr. Moore alleges that his contract with MSM was impaired by the defendants' intentionally discriminatory actions, which included summarily suspending his privileges, diverting cases to white physicians outside of Grady, and failing to provide operating rooms for surgery to the African-American doctors of MSM.  Dr. Moore alleges that these discriminatory acts impaired his contract with MSM because, "[a]s part of his contract and employment with MSM, [he] must have clinical privileges at a hospital in order to practice medicine and teach residents."  D.E. 1 at ¶ 87.  As Dr. Moore explains, without privileges (and, presumably, without patients or operating rooms), "[h]e cannot teach residents nor perform any clinical practice."  *Id.*  Although the complaint is not a model of clarity, we conclude that, at this stage of the case, it contains sufficient factual allegations to support Dr. Moore's § 1981 discrimination claim based on the alleged impairment of his contract with MSM, and therefore survives the defendants' motion to dismiss.  *See, e.g.*, *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294–95 (11th Cir. 1988) (holding that physician, who was dismissed from one hospital's residency program due to adverse recommendations by second hospital, could sue second hospital under § 1981 on the theory that the adverse recommendations were based on his race); *Faraca v. Clements*, 506 F.2d 956, 959

14

(5th Cir. 1975) ("a third party's interference with [contractual] rights guaranteed under [§§] 1981 and 1982 will subject such a person to personal liability.").[2]

**2**

Dr. Moore also argues that the affiliation agreement between Grady and MSM constitutes a second contractual relationship sufficient to support his § 1981 discrimination claim.  According to Dr. Moore, "Georgia law requiring hospitals to abide by their bylaws, and the Agreement between Grady and MSM, in which the Medical Staff Bylaws are implicated in the disciplinary provisions governing MSM faculty physicians, create an expectation of due process in the disciplinary actions that can be undertaken by [d]efendants in regard to [his] property interests in his hospital privileges."  Br. for Appellant at 33.

The district court (generally adopting the magistrate judge's report, which was not objected to) rejected this argument.  Because, under Georgia law, medical staff bylaws do not create a contract or a contractual relationship, *see Jimenez*, 596 F.3d at 1309, and "physicians do not have a broad property interest in continuing to practice medicine," *id.* at 1310 (citation omitted), the district court concluded that "the mere fact that the affiliation agreement refers to and incorporates the

---

[2] Because we hold that the allegations in the complaint are sufficient to support a § 1981 claim based on the contract with MSM, we do not address Dr. Moore's argument that the district court erred by not allowing him to amend his complaint.

15

bylaws does not otherwise create a protected property interest where there is none." D.E. 39 at 24; D.E. 44 at 21.

In addition, the district court (again adopting the magistrate judge's report) concluded that, even if the affiliation agreement somehow created a protected property interest in hospital staff privileges, Dr. Moore was not a party to the affiliation agreement and, based on the terms of that agreement, he was also not a third-party beneficiary with standing to assert any rights or enforce any terms under the affiliation agreement. *See* D.E. 39 at 24–27. Specifically, the district court relied on a provision in the affiliation agreement for "Third Party Beneficiaries" that stated: "None of the provisions of this Agreement are or shall be construed as for the benefit of or enforceable by any person not a Party to this Agreement, except that [Emory] shall be treated as a third party beneficiary with respect to the Agreement]." *Id.* at 26 (quoting the affiliation agreement, D.E. 18-3 at § 13.25).

Dr. Moore did not object to the magistrate judge's report on this issue. Although in this particular case we review *de novo* "the magistrate judge's conclusions of law [as] they were accepted and adopted by the district court,"

16

*Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1308 (11th Cir. 2013) (citations omitted), Dr. Moore's argument merits little discussion.[3]

The Supreme Court has recognized the possibility that a third-party intended beneficiary of a contract may have rights protected by § 1981. *See Domino's Pizza*, 546 U.S. at 476 n.3. But this does not eliminate the statutory requirement that the plaintiff be the one who "has or would have rights under the existing or proposed contractual relationship." *Id.* at 476. In *Domino's Pizza*, for example, the Supreme Court made clear that "[§] 1981 plaintiffs must identify injuries flowing from a racially motivated breach of *their own* contractual relationship, *not of someone else's*." *Id.* at 480 (emphasis added).

On appeal, Dr. Moore has seemingly abandoned any argument that he is a third-party intended beneficiary of the affiliation agreement between Grady and MSM. In any event, "[s]imply because [Dr. Moore] [might have] benefited from the performance of the contract" between Grady and MSM "does not afford [him] third party beneficiary status." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted). *See also AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007)

---

[3] This case was decided by the district court before the implementation of Eleventh Circuit Rule 3–1, which took effect on December 1, 2014, and provides that "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]"

("[T]he parties' intention to benefit the third party must be evident from the face of the contract.") (citations omitted); *Monroe v. Bd of Regents of Univ. Sys. of Ga.*, 602 S.E.2d 219, 225 (Ga. Ct. App. 2004) (affirming finding that plaintiff was not a third-party beneficiary because contract contained language that expressly limited who had rights). Therefore, we affirm the dismissal of Dr. Moore's § 1981 claim premised on the affiliation agreement.

**B**

In Count II, Dr. Moore alleges that he "was retaliated against by . . . Grady and the [Hospital] Authority in violation of § 1981 because of his opposition to the discriminatory practices of . . . Grady and the [Hospital] Authority, which included subjecting him and the other African-American physicians to limited surgery facilities and support staff and the assignment of certain medical cases to white Emory Doctors." D.E. 1 at ¶ 98. "Within days of making his complaint about [the] racially discriminatory treatment of the African American physicians from MSM by Grady and the [Hospital] Authority," his cases were subject to scrutiny and he was ultimately summarily suspended. *Id.* at ¶ 97.

"To establish a claim of retaliation under . . . [§] 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted).

18

"As with other statutory retaliation claims, such a claim under § 1981 requires that the protected activity involve the assertion of rights encompassed by the statute." *Jimenez*, 596 F.3d at 1311 (citations omitted).

*Jimenez* held that, because the suspension of medical staff privileges in and of itself does not implicate any rights protected by § 1981, a physician's charge with the Equal Employment Opportunity Commission regarding the suspension of medical staff privileges could not form the basis of a § 1981 retaliation claim. *See id.* *Jimenez* also concluded that none of the physician's other complaints to hospital administrators regarding allegations of discriminatory treatment could be construed to implicate a contract or property interest. *See id.* at 1311 n.5.

The district court correctly distinguished *Jimenez* because Dr. Moore had an independent contract with MSM, and did not assert an independent contractual right in his medical privileges at Grady. Nonetheless, based on its previous ruling concerning Dr. Moore's § 1981 discrimination claim, the district court dismissed the § 1981 retaliation claim. The district court concluded that Dr. Moore "fail[ed] to plead sufficient facts to show that his contract [with MSM] was actually impaired," and, therefore, that he "necessarily fail[ed] to sufficiently plead that he engaged in a protected activity when he opposed [d]efendants' practice." D.E. 44 at 20.

Because we hold that Dr. Moore pled sufficient facts to support his § 1981 discrimination claim, we reverse the district court's dismissal of Dr. Moore's § 1981 retaliation claim. On remand the district court is to re-examine the retaliation claim.

## IV

In sum, we affirm the district court's grant of the defendants' motion to dismiss as to Dr. Moore's § 1981 discrimination claim based on the affiliation agreement between Grady and MSM. We reverse as to Dr. Moore's § 1981 discrimination claim based on the employment contract with MSM and as to Dr. Moore's § 1981 retaliation claim. The case is remanded to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**