**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12144

————————————

DR. LANA FOSTER,

*Plaintiff-Appellee,*

*versus*

ECHOLS COUNTY SCHOOL DISTRICT,
ECHOLS COUNTY BOARD OF EDUCATION,

*Defendants,*

SHANNON KING, et al.,

individually and in their official capacities,

*Defendants-Appellants.*

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:23-cv-00089-WLS

————————————

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

Dr. Lana Foster was one of the first black children to integrate Echols County Schools. Later, she was one of the first black faculty members in the district—until she was fired in 2018. The school board cited ethical violations, but during her tenure alone, the district had settled at least three complaints relating to racially discriminatory employment practices—so Foster had her doubts. And when she filed a charge with the EEOC for employment discrimination and retaliation, the district settled those claims, too.

The resulting settlement agreement required the school district to promptly take certain actions, but Foster says they did nothing. She turned to federal court, suing the district, the school board, the school board members, and the former and current school superintendents. This time, the defendants did not settle. Instead, they all moved to dismiss. In particular, the school officials invoked qualified immunity, arguing that their alleged conduct—refusing to implement Foster's settlement agreement based on their racial animus toward her—did not violate clearly established law.

This last question is the only one on appeal, and we agree with the district court that qualified immunity does not apply; the school officials were on notice that interfering with a contract because of race was illegal. Still, the officials object that qualified immunity must apply because whether they can be held personally liable under § 1981 is an open question. And without certainty

about their personal potential for liability, they say, qualified immunity applies even in the face of plainly illegal conduct.

No. An official's understanding about whether he may be held liable is irrelevant. Qualified immunity asks whether officials were on notice that their alleged conduct was unlawful—not whether they could be sued for it. We affirm.

**I.**

Foster has lived in Echols County her whole life.[1] First making history integrating the local schools, she later became one of the district's first black educators. Several members of her family worked for the district, too. But according to Foster, it was not a smooth transition, and school administrators directed "racial hatred" at her family for decades. And during the 2008–2009 school year, the district moved her from her usual teaching role to what she calls a "less desirable Alternative School position" and stripped her of club leadership duties.

She sued the district, claiming that those moves were racially motivated. The parties settled in 2011, and the settlement required the district to pay Foster $40,000 and reinstate her club leadership role. But after the 2011 settlement, things got worse rather than better—at least according to Foster, who says the district told her that parents in the community objected to black

---

[1] Because this case comes to us on a motion to dismiss, we accept the complaint's factual allegations as true and construe them in Foster's favor. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1177 (11th Cir. 2025).

teachers and that white colleagues were told on pain of firing not to associate with her.

Less than a year after her suit, the U.S. Department of Education's Office of Civil Rights investigated Foster's complaints about the school district's noncompliance with Title VI's prohibitions against racial discrimination. The district quickly signed a "Resolution Agreement," which ended the investigation. The district agreed (among other things) to "develop a recruitment plan for increasing the number of qualified black applicants" and conduct Title VI training for "the Superintendent, all principals, and any other individuals who have any role in recruiting."

According to Foster, this agreement improved nothing, and the problems came to a head in 2018 when the district fired her. She contested her termination, and the Georgia Attorney General and Professional Standards Commission took her side, finding "no probable cause" to support her termination on the ethics grounds the district cited.

Foster returned to the courts. She sued the district for Open Records Act violations, and that suit revealed that two school board members who had played a part in deciding to fire her had used racial slurs in text messages. A charge with the EEOC for racial discrimination and retaliation soon followed. Rather than defend against Foster's new charge, the district again chose to settle. The parties' agreement, signed in 2020, required the district to pay Foster more than $130,000 and reclassify her firing as a "voluntary resignation." The district also agreed to "immediately"

24-12144              Opinion of the Court                    5

amend its recruitment and hiring practices and make them publicly available. And like the earlier Resolution Agreement, the new settlement agreement required the district to develop a plan to recruit more black applicants to apply for vacant positions.

About a year later, in 2021, Foster checked in on the district's progress. She filed another open records request, this time seeking documents related to compliance with the settlement agreement, including a copy of the district's updated hiring plan. The district's response was a link to a policy that had last been updated in 2013—years before it committed to developing a new plan. By early 2022 the district revised its policy, but according to Foster, the new approach too fell short of the settlement agreement's demands.

Foster sued both the district and the school board, plus seven school officials—the former district superintendent, the current superintendent, and all five school board members. The defendants moved to dismiss the complaint for failure to state a claim. In response, Foster filed an amended complaint with six claims:

(1) denial of her right to make and enforce contracts based on her race under 42 U.S.C. §§ 1981 and 1983, against all defendants;

(2) breach of contract under Title VII, against the school district and board;

(3) breach of contract under Georgia law, against the school district and board;

(4) breach of the implied covenant of good faith and fair dealing under Title VII and Georgia law, against all defendants;

(5) breach of third-party beneficiary agreement under Title VII and Georgia law, against the school district and board; and

(6) retaliation for engaging in protected activities under 42 U.S.C. §§ 1981 and 1983, against all defendants.

All in all, she alleged that the school officials were "aware of the District's obligations" under the settlement agreement "and chose to ignore" them because of "race-based animus" toward her. The defendants again moved to dismiss for failure to state a claim. And the school officials defended against Foster's § 1981 claims on qualified immunity grounds.

The district court dismissed Foster's complaint in part. That included rejecting, against all defendants, Foster's retaliation claim, plus her state-law breach-of-contract claim and her third-party beneficiary claim against the district and board. The court also dismissed her claim for breach of the implied covenant of good faith and fair dealing against the school officials. The rest of the lawsuit remains. For the school district and the board, Foster's claims for the denial of her rights under § 1981, breach of contract under Title VII, and breach of the implied covenant are still in play.[2] And for the school officials, the district court allowed

---

[2] The district court allowed Foster's Title VII breach-of-contract claim to proceed against the school district and board to the extent that it relies on a breach of Section III of the Settlement Agreement. And it allowed her breach-

Foster's § 1981 denial-of-rights claim to move forward and denied qualified immunity.[3]  This interlocutory appeal followed on the qualified immunity question.

## II.

We review a district court's denial of qualified immunity on a motion to dismiss de novo.  *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

## III.

This appeal asks only one thing: whether Foster's complaint states a violation of clearly established law sufficient to overcome the school officials' qualified immunity defense.  It does.

## A.

We begin with the basics on qualified immunity.  "When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (alteration adopted and quotation omitted).  But such actions come with costs.  *Id.*  To name one, subjecting government officials to

---

of-the-implied-covenant claim to proceed against the school district and board to the extent that it relies on federal law.

[3] Foster brought her denial-of-rights claim under both § 1981 and § 1983 because § 1981 confers a right, but it does not itself provide a cause of action against state actors.  *See Butts v. County of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000).  So Foster, like all other § 1981 plaintiffs with claims against state actors, must rely on § 1983 to pursue her denial-of-rights claim against the school officials.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

"personal monetary liability and harassing litigation" risks "unduly inhibit[ing] officials in the discharge of their duties." *Id.*

The Supreme Court balanced these objectives when it recognized qualified immunity as an affirmative defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). To lessen the perceived burdens on officials performing "discretionary functions," qualified immunity shields them from civil liability—but only when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 816; *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation omitted). Put differently, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And it shields officials not only from personal liability for monetary damages, but also from defending a costly action through trial. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). So courts must decide "at the earliest possible stage in litigation" whether qualified immunity applies. *Id.* at 232 (quotation omitted).

That analysis involves two questions, and those two questions can be considered in either order: whether the officials "violated a federal statutory or constitutional right," and whether "the unlawfulness of their conduct was clearly established at the time" they acted. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation omitted). Unless the answer for both is yes, an official is entitled to qualified immunity. *See id.*; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

The first question, whether the defendant violated the law, may be easier or harder in a given case. But not because of qualified immunity—some applications of law to fact are just difficult. But the second question, whether the law is clearly established, presents a set of doctrinal challenges unique to qualified immunity. For a right to be clearly established, it must be "sufficiently clear that every reasonable official would understand that what he is doing" violates it. *Wesby*, 583 U.S. at 63 (quotation omitted). This inquiry is an objective one, and depends on whether an official had "fair warning" that his conduct was unlawful. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) (quotation omitted); *see Harlow*, 457 U.S. at 818. Qualified immunity, in short, protects government officials unless "existing law" puts the unlawfulness of their conduct "beyond debate." *Wesby*, 583 U.S. at 63 (quotation omitted).

What's more, the "nature of *particular* conduct" is the key inquiry. *Mullenix*, 577 U.S. at 12 (alteration adopted and quotation omitted). After all, defining the law too generally would make it difficult for an official to reasonably anticipate its application to particular facts. *See id.*; *Anderson*, 483 U.S. at 639. So courts are charged to define clearly established law with enough "specificity" that a reasonable officer will understand that "his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. at 63 (quotations omitted). It's true that in some rare-but-obvious cases, the unlawfulness of the conduct can be clear even without existing precedent that is directly on point. *Id.* at 64; *see also Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022). But either way, the baseline of

the qualified immunity analysis is the nature of the official's alleged conduct.

## B.

With that, we turn to the school officials' qualified immunity defense.[4] They contend that their alleged conduct—impairing Foster's contractual relationship with the district because of her race—did not violate clearly established law. We disagree.

Section 1 of the Civil Rights Act of 1866, now codified as 42 U.S.C. § 1981, promises that every person "shall have the same right" to "make and enforce contracts . . . as is enjoyed by white citizens." The law defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This provision protects individuals against "impairment" by both private parties and officials acting "under color of State law." *Id.* § 1981(c).

---

[4] The school officials do not appear to challenge the statutory-violation prong on appeal. That is, they do not argue that Foster failed to plausibly allege that the school officials denied her rights under § 1981 (setting aside whether those rights are clearly established). Following the school officials' lead, we assume that Foster plausibly alleged a statutory violation against each school official. Accordingly, we address only step two of the qualified immunity analysis: whether the alleged conduct violated clearly established law.

24-12144          Opinion of the Court          11

Foster alleges that the school officials denied her right to "make and enforce contracts" under § 1981 by deliberately failing to hold up their end of the settlement agreement because of their racial animosity toward her.  The parties agree that Foster's trial court briefing did not identify a case with "materially similar facts" to this one, as is ordinarily required. *Powell*, 25 F.4th at 920.  Indeed, neither side adequately developed its argument before the district court.  But we, like the district court, have little difficulty in reaching the narrow legal conclusion that as a matter of "obvious clarity," all reasonable government officials would know they cannot refuse to follow a contract because of the contracting party's race. *Id.* at 921.

First, take § 1981's text.  That law prohibits officials from "impair[ing]" a contracting party's equal right to enjoy the "benefits" of their contractual relationship, and Foster alleges that the school officials did exactly that. 42 U.S.C. § 1981.  She identifies an impaired contractual relationship: her settlement agreement with the district.  And she alleges that the officials' conduct denied her the benefit of her bargain: a revised hiring policy that reflects the district's efforts to remedy its poor track record with black employees.  The officials knew that the district had settled with Foster.  And they knew that the agreement required them to take certain actions.  Yet they chose not to take them.  Worse still, they made that choice because of Foster's race, at least according to the

12                    Opinion of the Court                24-12144

pleadings.  Foster thus alleges that the school officials violated her clearly established § 1981 rights.[5]

Our precedent says the same thing.  In *Faraca v. Clements*, for example, Dr. Andrew Faraca (a white male) applied for a position with what was then called the Georgia Retardation Center.  506 F.2d 956, 957–58 (5th Cir. 1975).[6]  He was well-qualified, but the Center's director told his employees to reject Faraca because his wife was black.  *Id.* at 958.  The couple sued both the Center and its director under § 1981.  *Id.* at 957.  After a bench trial, the district court held the director personally liable for interfering with Faraca's prospective contract rights, and we affirmed.  *Id.* "Technically," the opinion acknowledged, the State "was the prospective employer and only it would be in a position to refuse to enter into a contract."  *Id.* at 959.  Even so, we permitted a suit

---

[5] It's true that "[e]ach defendant is entitled to an independent qualified-immunity analysis."  *Myrick v. Fulton County*, 69 F.4th 1277, 1301 (11th Cir. 2023) (quotation omitted).  But we again emphasize that the school officials did not adequately develop an argument on appeal that Foster failed to plausibly allege that they (individually) violated her rights under § 1981.  On remand, Foster must carry her burden in proving that each school official engaged in conduct that was a but-for cause of the impairment of her § 1981 rights.  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).  Here, we narrowly hold that—if proven—that conduct would violate clearly established federal law.

[6] This Court has adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

for personal liability based on the director's third-party "interference with those rights guaranteed under" § 1981.  *Id.*

So too here.  As in *Faraca*, Foster alleges "interference" with her contractual rights because of racial animus.  *Id.*; *see* 42 U.S.C. § 1981.  Reasonable officials—reading § 1981's text, considering *Faraca*, or both—would understand that they could not "impair[]" Foster's equal right to enjoy the settlement agreement's benefits because of her race.  42 U.S.C. § 1981(c).  We thus reject the school officials' contention that their alleged conduct did not violate clearly established law.

## C.

The officials protest this result, but their counterarguments fall short—mainly because they misunderstand qualified immunity.

The officials first resist the conclusion that the law clearly prohibits nonparties to a contract from interfering with the plaintiff's contractual rights under § 1981.[7]  Despite both the statute's text and this Court's precedent, they say it is an open question.  True enough, in *Domino's Pizza, Inc. v. McDonald*, the Supreme Court explained that the plaintiff must have rights under

---

[7] In dismissing Foster's breach-of-the-implied-covenant claim against the school officials, the district court concluded that they are nonparties to the settlement agreement.  Neither party contests that conclusion for purposes of this qualified immunity appeal—even though the former superintendent signed the agreement on the district's behalf.  We thus assume that all school officials (regardless of their titles) are nonparties to the settlement agreement.

an existing (or proposed) contract to bring a § 1981 claim. 546 U.S. 470, 479–80 (2006). But that is irrelevant here—Foster has rights under the settlement agreement.

The school officials, however, misunderstand *Domino's*, arguing that it also says that a *defendant* must be a party to the contract for a § 1981 claim to follow. No. In fact, *Domino's* did not consider that question—but this Court has. *See Faraca*, 506 F.2d at 959. We have already explained *Faraca*, in which we allowed a plaintiff to sue a nonparty to a contract for interfering with the plaintiff's prospective contract rights. *See id.* Same goes for *Moore v. Grady Memorial Hospital Corporation*, in which yet another § 1981 claim proceeded on a third-party interference theory. 834 F.3d 1168 (11th Cir. 2016). There, a black professor alleged that the hospital where he performed clinical duties made racially motivated decisions to oust him from the operating room and suspended his hospital privileges, putting him in breach of his employment contract with his university. *Id.* at 1169, 1171. He sued the hospital and several doctors under § 1981 for interfering with his employment contract. *Id.* at 1171. His claims survived dismissal because we held that he had plausibly alleged that the hospital and several doctors, all nonparties to the contract, impaired his agreement with the university. *Id.* at 1171, 1174.

The school officials also press *McCarthy v. City of Cordele*, but there too, they miss the mark. 111 F.4th 1141 (11th Cir. 2024). *McCarthy* involved an employment discrimination suit against a municipal employer. *Id.* at 1147. In that context, our cases require

the plaintiff to allege that the defendant had the power to "effectuate" the plaintiff's firing. *Id.* (quotation omitted); *see Quinn v. Monroe County*, 330 F.3d 1320, 1326–28 (11th Cir. 2003). For McCarthy, because the Commission itself fired him, not the individual Chair, his § 1981 claim against the Chair could not survive. *McCarthy*, 111 F.4th at 1147.

The decision goes no further. And if *McCarthy* did eliminate third-party liability in this context, it would contradict *Faraca* and *Moore*. That, in turn, would violate this Court's prior-panel precedent rule, which does not allow that kind of do-over. *See Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018).

### D.

These cases, besides not persuading us, are somewhat of a sideshow to the officials' primary point. The real meat of their argument is that qualified immunity applies because uncertainty exists about whether government officials can be held personally liable under § 1981. In support, they identify several out-of-circuit cases questioning whether § 1981 claims are cognizable against government officials. *See, e.g.*, *Johnson v. Halstead*, 916 F.3d 410, 419 n.3 (5th Cir. 2019); *Jones v. City of Houston*, 756 F. App'x 341, 347 n.6 (5th Cir. Nov. 20, 2018) (unpublished). One from this Court, too, albeit in an unreasoned footnote in an unpublished opinion. *See Okwan v. Emory Healthcare Inc.*, No. 20-11467, 2021 WL 4099236, at *1 n.1 (11th Cir. Sept. 9, 2021) (unpublished).

The problem is that this liability argument is completely beside the point. It "asks the wrong question about qualified

immunity." *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021); *accord O'Connor v. Eubanks*, 83 F.4th 1018, 1025 (6th Cir. 2023) (Thapar, J., concurring). The *right* question is whether the wrongfulness of an official's conduct was clearly established—not whether the rules of individual liability were settled. *Taylor*, 999 F.3d at 491. After all, the qualified immunity standard is an objective inquiry that focuses on the defendants' "actions" or "conduct." *Id.* (collecting cases). So whether a defendant is sure that he can be held civilly liable for his illegal conduct plays no part in the qualified immunity analysis. *See id.*

Our precedent supports this understanding. In *Williams v. Aguirre*, for instance, the defendant officers were not entitled to qualified immunity for malicious prosecution, even though our case law on that cause of action was "unsettled" at the time. 965 F.3d 1147, 1169 (11th Cir. 2020). Why? The "doctrinal tensions" that we identified concerned the "vehicle" controlling liability for concededly unlawful conduct—not the lawfulness of the conduct itself. *Id.* Because the latter question is what matters for qualified immunity, and the law clearly prohibited the alleged conduct, we rejected the officers' attempt to avoid suit. *Id.*

*Taylor v. Ways*, from the Seventh Circuit, is instructive, too. 999 F.3d 478. There, the plaintiff sued several government officials under § 1983, alleging that he was fired because of his race in violation of the Equal Protection Clause. *Id.* at 481. One defendant asked for qualified immunity on the grounds that "it was not clearly established that a subordinate employee could be held liable

24-12144                Opinion of the Court                17

for unlawful efforts to cause the termination of another employee."
*Id.* at 491 (emphasis omitted).   The court said no, correctly
reasoning that the qualified immunity analysis focuses on whether
the official's conduct violated a clearly established right—not
whether that conduct may give rise to liability.  *Id.*  We agree.  If
an official knows (or should know) that his actions are illegal, it is
no excuse that liability may not have caught up with him.  That is
a question about the merits, not immunity.

The cases the school officials rely on do not convince us
otherwise.  First up is *Ziglar v. Abbasi*, in which a set of executive
branch officials were accused of on-the-job conspiracy in post-9/11
policymaking.  582 U.S. 120, 125–26, 152 (2017).  The Supreme
Court granted them qualified immunity.  *Id.* at 155.  Why?
Uncertainty about whether the law prohibited the officials'
conduct: "The question with respect to the § 1985(3) claim is
whether a reasonable officer in petitioners' position would have
known the alleged conduct was an unlawful conspiracy."  *Id.*  The
officials here, in contrast, equate uncertainty about the lawfulness
of their alleged conduct with disagreement about whether they can
be held personally liable for it.  Those are not the same.  And only
the first has anything to do with qualified immunity.

To be fair, at least one court has endorsed the
misunderstanding pressed by the school officials.  The Fifth Circuit
reversed a denial of qualified immunity because "it was not clearly
established that public employees are subject to individual liability"
under the Family and Medical Leave Act at the time the challenged

conduct occurred. *Modica v. Taylor*, 465 F.3d 174, 188 (5th Cir. 2006). But that out-of-circuit precedent does not persuade us. Plus, as long as we are counting noses, the Tenth Circuit confronted the same issue and came out the other way. *See Gray v. Baker*, 399 F.3d 1241, 1245 (10th Cir. 2005). That court explained that "the question of whether the defendants are subject to individual liability under the FMLA is one of statutory construction that had no bearing on" whether the law clearly prohibited the defendants' conduct. *Id.* at 1245. We agree—the officials' uncertainty about whether they could face civil liability for illegal conduct has nothing to do with the qualified immunity analysis. The relevant question is whether their conduct was unlawful, not whether a plaintiff can successfully haul them into court for it.[8]

The school officials' argument, taken to its full extent, would give government officials a free pass to violate the law whenever the path to their personal liability is not well-trod. That cannot be the case. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. It does not give them a license to "knowingly violate the law." *Id.* (quotation omitted).

In short, according to Foster's allegations, the defendant school officials impaired her ability to reap the full benefits of her contract with the district. And they did so because of deep-seated

---

[8] We take no position on the merits of whether individual government officials can face personal liability under § 1981.

racial animus toward her.  Under § 1981, every reasonable official would have understood that conduct to be unlawful, and that conclusion forecloses the school officials' request for qualified immunity.

★    ★    ★

Foster alleges that the defendants engaged in conduct that violated clearly established law.  Accordingly, we **AFFIRM** the district court's decision denying qualified immunity.