In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1410

PERCY TAYLOR,

*Plaintiff-Appellee,*

*v.*

JOSEPH WAYS and ZELDA WHITTLER,

*Defendants-Appellants.*

No. 20-1411

PERCY TAYLOR,

*Plaintiff-Appellee,*

*v.*

GREGORY ERNST,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-01856 — **Mary M. Rowland**, *Judge.*

ARGUED OCTOBER 29, 2020 — DECIDED JUNE 2, 2021

Before FLAUM, KANNE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Percy Taylor was fired from his job as a police officer with the Cook County Sheriff's Office. Taylor contends it was because of his race. He has sued the Sheriff's Office under Title VII of the Civil Rights Act of 1964 and defendants Joseph Ways, Zelda Whittler, and Gregory Ernst under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment. Defendants maintain that Taylor was terminated for having fired pellets with an air rifle at his neighbor in March 2011, a charge that Taylor denies.

Defendant Ernst was the lead investigator assigned to Taylor's case. Taylor offers evidence that Ernst engineered his firing based on racial animosity. Taylor also asserts that defendants Ways and Whittler, who are or were senior officials in the Sheriff's Office, are liable because they both reviewed Ernst's final report of his investigation and endorsed his recommendation that Taylor be fired.

The district court denied the individual defendants' motions for summary judgment based on the defense of qualified immunity, and they have brought these interlocutory appeals of those denials. As we explain below, the district court correctly denied qualified immunity to Ernst. The district court erred, however, in denying qualified immunity to Ways and Whittler. We therefore affirm in No. 20-1411 and reverse in No. 20-1410, and remand the case to the district court, where Taylor's Title VII claim remains pending.

I.  *Factual and Procedural Background*

In reviewing a denial of summary judgment based on qualified immunity, we are limited to deciding questions of

law, so we recount the facts as stated by the district court in its assessment of the summary judgment record and give the plaintiff the benefit of his evidence and favorable inferences from it. *Estate of Clark v. Walker*, 865 F.3d 544, 547 (7th Cir. 2017); *White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007) (accepting plaintiff's version of the facts or the facts the district court assumed as the source of undisputed facts for a qualified immunity appeal); *Knox v. Smith*, 342 F.3d 651, 656 (7th Cir. 2003) (accepting plaintiff's version of facts for a qualified immunity appeal).

A. *The Facts for Summary Judgment*

1. *The Reported Shooting Incident*

On March 8, 2011, Harold Woolfolk was working on a pickup truck that belonged to his neighbor, Mary Wolfe, at her residence in Chicago, Illinois. Woolfolk claims to have been inside the truck when he heard numerous "poofs" and saw several "splats" on Wolfe's windshield. According to Woolfolk, he saw another neighbor, plaintiff Percy Taylor, pointing a BB gun out of the third-floor window of the building facing the rear of Wolfe's property.

Wolfe called 911 and reported that someone had shot at the windshield of her truck. The Chicago Police Department (CPD) dispatched two officers to her home. One officer observed that nine shots had struck the vehicle.[1] CPD turned the

---

[1] The record states that the officer observed that "shots" had struck the vehicle. The ambiguity of the term "shots" reflects an ongoing dispute in this case: were these shots from an air-powered BB gun? Another sort of air rifle? A handgun or other firearm? And were any officers—from the CPD or the Sheriff's Office—attuned to the fact that these distinctions

investigation over to the Sheriff's Office because the subject was a Sheriff's Office employee, plaintiff Taylor.

### 2. *Ernst's Investigation of the Shooting Incident*

The following day, March 9, Ernst and two other investigators for the Sheriff's Office of Professional Responsibility, or OPR, visited Wolfe's home to interview her and Woolfolk and to photograph Wolfe's truck. The three officers observed what appeared to be nine pellet or shot marks on Wolfe's truck. Woolfolk identified Taylor as the man who had shot at him. Woolfolk also said that he wanted to press charges against Taylor. Ernst and another officer took Taylor into custody.

On March 10, Ernst obtained a search warrant for Taylor's vehicle and residence behind Wolfe's residence. The officers did not recover a BB gun or ammunition during their searches.

OPR Investigator George Avet has testified that during the search, Ernst used racial slurs, saying that Taylor "lived like a n****r" and referring to Taylor as a "porch monkey." Avet testified that Ernst used the word "n****r" a total of two to five times while at Taylor's residence. Avet also testified that, back at OPR headquarters, Ernst was upset that the search of Taylor's home and vehicle had failed to produce a weapon and declared: "We're [going] to get this n****r."

Taylor, meanwhile, denied shooting at either Wolfe's truck or Woolfolk. He told OPR investigators that he was at the grocery store when the alleged shooting occurred. Upon review

---

might help resolve Woolfolk's and Taylor's competing accounts of the shooting incident?

of video surveillance from the grocery store, investigators determined that it was at least possible for Taylor to have fired the reported shots and arrived at the store when he did.

On March 16, Wolfe and Woolfolk signed criminal complaints against Taylor for aggravated assault and criminal damage to property. These criminal charges were ultimately dismissed. While investigating the alleged shooting, Ernst also learned that Taylor had been arrested for and convicted of driving under the influence in Missouri in 1999 while he was a deputy sheriff.

### 3. *The Loudermill Hearing*

On March 22, Taylor attended a so-called *Loudermill* hearing about the shooting and DUI incidents.[2] Ernst testified for the Sheriff's Office. Taylor was asked whether he had reported his DUI conviction to the Sheriff's Office. Taylor told the *Loudermill* board that he had reported his arrest and conviction to Sergeant Mpistolarides in 1999. The *Loudermill* board voted to suspend Taylor with pay pending Merit Board action.

### 4. *Ernst's Report of Investigation*

On April 11, Ernst submitted his Report of Investigation to the other defendants here, OPR Executive Director Joseph Ways and Cook County Undersheriff Zelda Whittler. As part of his investigation, Ernst contacted Sergeant Mpistolarides, who told Ernst that Taylor had not reported his 1999 DUI

---

[2] See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (holding that public employee with property interest in his job had federal due process right to notice and opportunity to respond *before* he could be removed from his job even if more elaborate hearing was available after removal).

arrest and conviction. (Taylor maintains that he reported both offenses to the Sheriff's Office.) In his Report, Ernst recommended that Taylor be terminated from his position on account of the shooting incident and the failure to report his DUI arrest and conviction.

Ernst's Report failed to mention potentially exculpatory evidence, including Woolfolk's extensive criminal history and the complicated personal history between Woolfolk and Taylor. For example, Taylor had previously reported Woolfolk for theft, including stealing Taylor's television and a drain-cleaning cable. And on the day that Taylor was arrested, Taylor had spoken with a city sanitation worker about Woolfolk's unauthorized use of Taylor's trash cans to dump Woolfolk's own trash. Ernst's Report also failed to mention that no weapon was recovered from the search of Taylor's residence or vehicle. His Report further failed to note the lack of physical evidence—including recovered pellets—that might have corroborated Woolfolk's account.

OPR investigators noted the following damage to Wolfe's truck: (i) four strike marks on the windshield, possibly created by pellets; (ii) one possible gunshot hole in the right edge of the hood; (iii) one possible gunshot hole in the front right headlamp; (iv) three possible gunshot holes in the front left turn signal that had penetrated the engine compartment; and (v) a strike mark on the interior left wheel well. The investigators searched the engine compartment for projectiles but were unable to locate any. Plaintiff's police expert Robert Johnson opined that it is difficult to explain the lack of recovered projectiles if the incident occurred as Woolfolk claimed.

Johnson also noted what seems like a fundamental problem with Ernst's account: the damage to the headlights and

windshield of Wolfe's truck could not have occurred with someone firing from the third-floor window of Taylor's residence. According to Johnson, the rear end of the truck was facing the third-floor window at the time of the alleged shooting. Any shots fired from Taylor's window should have hit the rear of the truck—not the already damaged front. Ernst argues that he did not learn until years later that the truck had been moved, though this fact strikes us as so elementary that it's hard to understand how professional investigators would not have asked about it.

     5.   *The Holbrook Memo*

After Ernst submitted his report, Police Chief Dewayne Holbrook sent a memo to Undersheriff Whittler noting his concerns about certain weaknesses in the investigation. Holbrook explained that Ernst's investigation left too many questions unanswered. The memo also revealed that prior to the *Loudermill* hearing, the Sheriff's Office was "put off time and again in response to its requests to view the investigatory file prior to the hearing" and received only "some" of the requested evidence at 5:00 pm on March 21—the evening before the hearing.

The Sheriff's Office insists that even if Ernst's Report failed to cover all the available information, the office received the "entire file" and the investigation involved input and evidence from others, not just Ernst. Whittler testified that, in general, her recommendation for officer discipline would be based on the contents of the entire OPR file. But she also testified that the OPR's function is to investigate and recommend discipline consistent with past practice, while her role as "the final signature" was to ensure that the investigators met the standard for sustaining a case. In other words, at the "final

signature" stage of the disciplinary process, Whittler said, she did not generally assess the weight of the evidence in the report. Ways testified similarly that his custom was to review reports such as Ernst's "for correctness, completeness, and thoroughness." Neither Ways nor Whittler stated that they reviewed and considered Taylor's entire OPR file or that they independently investigated the information supplied by Ernst. Critical for these appeals, however, Taylor has offered no evidence of racial animus on the part of Ways or Whittler, nor any evidence that they knew of any racial animus on the part of Ernst.

6. *The Merit Board Proceedings*

On April 18, 2011, following review of Ernst's Report, Ways sustained the charges and recommended Taylor's termination. On April 27 and 28, both Ways and Whittler signed off on the Report as part of the "Command Channel Review" process. Seven months later, in October 2011, a formal complaint was filed with the Merit Board charging Taylor with misconduct for the shooting incident and his alleged failure to report the DUI arrest and conviction. Pending resolution, Taylor was assigned to work in the Court Services Division.

On February 27, 2013, the Merit Board conducted an evidentiary hearing. Ernst testified that Taylor's conduct violated the Sheriff's Office's general orders, rules, and regulations. Taylor has testified that before the hearing, Ernst threatened him: "You better quit, n****r." On October 30, 2013, the Merit Board issued its decision, ordering that Taylor be removed from his position effective immediately.[3]

---

[3] In September 2011, Taylor was involved in two unrelated incidents that resulted in separate *Loudermill* hearings and separate complaints filed

B. *This Lawsuit*

On March 8, 2013, Taylor filed this suit against Cook County, the Sheriff's Office, Cook County Sheriff Thomas J. Dart, Ways, Whittler, Ernst, and other individual defendants asserting claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. Defendants filed motions for summary judgment on all claims.

The district court denied summary judgment on three of Taylor's claims: (i) his Title VII race discrimination claim against the Sheriff's Office; (ii) the § 1983 equal protection race discrimination claim against Ernst, Ways, and Whittler; and (iii) an indemnification claim against Cook County. Only Taylor's § 1983 equal protection claim is at issue in these interlocutory appeals. The district court denied qualified immunity to the three individual defendants, citing evidence of Ernst's racial animus and his heavy involvement in the disciplinary proceedings, and Ways' and Whittler's respective roles as final decision-makers. *Taylor v. Cook County Sheriff's Office*, 442 F. Supp. 3d 1031, 1050 (N.D. Ill. 2020). We address first Ernst and then Ways and Whittler, considering first the scope of our jurisdiction and then the merits of the qualified immunity defenses.

---

with the Merit Board. The first incident involved a misdemeanor battery allegation against Taylor and the second involved an allegation that Taylor had threatened a Cook County employee. The complaints were dismissed after Taylor's termination in October 2013. The Sheriff's Office later sought reinstatement of both complaints. Since those complaints are not at issue in these appeals, we do not discuss them further.

II. *Defendant Ernst's Appeal*

A. *Scope of Appellate Jurisdiction*

We begin with appellate jurisdiction, which Taylor insists we lack entirely. A denial of qualified immunity can be appealed only "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). When the denial stems from a finding that material facts are disputed, however, the officer's claim of immunity and the merits of the plaintiff's claim that his rights have been violated can blend together. *Estate of Davis v. Ortiz*, 987 F.3d 635, 639–40 (7th Cir. 2021).

In these cases, because "fact-related legal issues" can dominate the immunity defense, the appellant must be willing to set aside his version of the facts and accept for the interlocutory appeal the facts as the district court assumed them or in the light most favorable to the non-moving party. *Id.* at 639, quoting *Johnson v. Jones*, 515 U.S. 304, 314 (1995); see also *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011) (rejecting "back-door effort to contest the facts" in an interlocutory appeal of a denial of qualified immunity). Put another way, if the appellant's supposedly legal arguments are "dependent upon, and inseparable from, disputed facts," appellate jurisdiction is lacking. *Gant v. Hartman*, 924 F.3d 445, 449 (7th Cir. 2019), quoting *White*, 509 F.3d at 835. If, however, the appellant's legal arguments can be separated from his version of the facts, we may review the purely legal question "whether a given set of undisputed facts demonstrates a violation of clearly established law." *Estate of Davis*, 987 F.3d at 639–40, quoting *Johnson*, 515 U.S. at 319.

Ernst raises both legal and factual arguments to invoke qualified immunity. The legal arguments give us jurisdiction over his appeal, but at this stage of the case, we may not consider his factual arguments. For example, Ernst argues that his actions were not the proximate cause of Taylor's termination, and he contends that he did not exert any influence on the decisions of Ways or Whittler. He also argues that the Merit Board, following a formal, adversarial hearing, terminated Taylor based on the evidence presented, independent of any racial animus on his part. Ernst acknowledges that proximate cause is generally an issue of fact, but he argues that the facts surrounding the cause of Taylor's firing are not in dispute. We read the record differently.

Leaving aside the broader question whether an issue of proximate cause is ever suitable for an interlocutory appeal of a denial of qualified immunity, the facts surrounding the cause of Taylor's firing are disputed, as the district court found. We may not decide as a matter of law and in an interlocutory appeal that Ernst and his (presumed) racial animus did not influence Ways' or Whittler's recommendations or the Merit Board's decision to terminate Taylor. We thus lack jurisdiction over Ernst's causation arguments. See, e.g., *Koh v. Ustich*, 933 F.3d 836, 848 (7th Cir. 2019) (reiterating that causation arguments are beyond the scope of appellate jurisdiction in an interlocutory appeal of a denial of qualified immunity); *Jackson v. Curry*, 888 F.3d 259, 266 (7th Cir. 2018) ("We presently lack jurisdiction over the superseding-cause issue as it is not a pure legal question related to qualified immunity.").

Next, in a variation on the proximate cause argument, Ernst argues that none of the evidence concerning his alleged racial animus against Taylor could transform his "reasonable"

termination recommendation into an equal protection viola-
tion. This is a non-starter. The evidence of Ernst's racial slurs
during the OPR investigation and just before the Merit Board
hearing would allow a reasonable jury to infer that he acted
out of racial animus. The district court found disputed issues
of fact on whether Ernst's (presumed) racial animus caused
Taylor's termination. We lack jurisdiction to consider this var-
iation on a factual argument. See *Gant*, 924 F.3d at 451 (dis-
missing interlocutory appeal of a denial of qualified immun-
ity because appellant's argument relied on disputed fact);
*Jackson*, 888 F.3d at 262 ("[D]efendants cannot immediately
appeal factual determinations regarding qualified immun-
ity."); *Gutierrez v. Kermon*, 722 F.3d 1003, 1014 (7th Cir. 2013)
(dismissing interlocutory appeal based on "a genuine factual
dispute in need of a jury's attention").

Ernst argues that none of the evidence of his racial animus
undermines his reasonable belief that Taylor committed the
crimes of aggravated battery and criminal damage to prop-
erty. He argues that the Holbrook memo, at most, catalogues
"subjective investigative deficiencies" that he had no consti-
tutional duty to investigate once he had probable cause to ar-
rest Taylor. This argument both misses the mark and falls out-
side our jurisdiction in this interlocutory appeal.

For purposes of summary judgment, the district court as-
sumed that Ernst had probable cause to arrest Taylor on
March 9, 2011, the day after the reported shooting incident.
We assume so as well. But the relevant legal question in this
appeal is whether probable cause to arrest Taylor on March 9
provides Ernst a complete defense for racially discriminatory
actions in the later OPR investigation of Taylor and the pro-
ceedings that led to Taylor's termination. That question is

embedded in the larger issue of qualified immunity for Ernst discussed below.

B. *Merits of Qualified Immunity for Ernst*

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). On summary judgment, the qualified immunity defense depends on two questions: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017), quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). If the answer to either question is no, the defendant official is entitled to summary judgment. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). We may choose which prong to address first. *Pearson*, 555 U.S. at 236; *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). When a district court denies summary judgment based on qualified immunity, our review of legal issues is both permitted and de novo. *Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012).

Taylor alleges that the defendants violated his equal protection rights under the Fourteenth Amendment by terminating his employment based on his race. The Equal Protection Clause prohibits intentional racial discrimination by state and local officials, and a person who is subjected to such discrimination may seek relief under 42 U.S.C. § 1983. *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th

Cir. 1996); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 624 (7th Cir. 1986).

    1.  *Step One: Violation of a Constitutional Right*

The district court found that Taylor presented sufficient evidence that a reasonable jury could find that Ernst, motivated by racial animus, caused Taylor's firing. Ernst argues he is entitled to qualified immunity because the law was not clearly established that an official with his investigatory responsibilities, but without decision-making authority, could be held liable on a "cat's paw" theory for race-motivated firing. Ernst also argues that the district court erred by refusing to consider the non-discriminatory rationale that he provided in defense of his termination recommendation: that the probable cause he had to arrest Taylor immunized him for anything that happened later. We consider these arguments in turn.

For his claim against Ernst as an individual, Taylor relies on the cat's paw theory of liability used so often in employment discrimination cases. The theory takes its name from one of Aesop's fables. E.g., *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011); *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). Taylor's theory is that Ernst's racial animus poisoned the investigation against him and that Ways, Whittler, and the Merit Board failed to take sufficient steps of their own to remove the taint of Ernst's racial animus. In response, Ernst argues, in effect, that as the monkey who used Ways, Whittler, and the Merit Board as his cat's paw, he is shielded from individual liability under § 1983. We disagree.

In 2012 we observed that a cat's paw theory would sup-
port imposing individual liability under § 1983 on subordi-
nate government employees who act with unlawful motives
to cause the actual decision-makers to take action against an-
other employee. *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012),
overruled on other grounds by *Ortiz v. Werner Enters., Inc.*, 834
F.3d 760, 764–66 (7th Cir. 2016). We noted that at least five
other circuits had held or said as much. *Id.* at 898–99 (collect-
ing cases).[4] So despite Ernst's non-supervisory role, he is not

---

[4] In *Smith*, we cited *Tejada–Batista v. Morales*, 424 F.3d 97, 102 (1st Cir. 2005)
(affirming jury verdict against subordinate law enforcement officers who,
to retaliate against plaintiff for engaging in protected First Amendment
activity, recommended his discharge; the "properly motivated" decision-
maker "does not insulate[] the ill-motivated subordinate" who "is a but-
for cause of the firing"); *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir.
2005) ("While Segura made the final decision to transfer Plaintiffs, Pratt,
though a subordinate, might be liable if he possessed a retaliatory motive
which set in motion the events that ultimately led to Plaintiffs' transfers.
In this case, Pratt did *not* set in motion the chain of events which ultimately
led to Plaintiffs' transfers.") (citations omitted); *Strahan v. Kirkland*, 287
F.3d 821, 826 (9th Cir. 2002) ("Even if the ultimate decision-maker can es-
tablish that the adverse action was not in retaliation for protected conduct,
*a subordinate with a retaliatory motive can be liable* 'if an improper motive sets
in motion the events that lead to termination that would not otherwise
occur … . [A] subordinate cannot use the nonretaliatory motive of a supe-
rior as a shield against liability if that superior never would have consid-
ered a dismissal but for the subordinate's retaliatory conduct.'") (empha-
sis added), quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854–55 (9th
Cir. 1999); *Darnell v. Ford*, 903 F.2d 556, 561–62 (8th Cir. 1990) (affirming
jury verdict against defendant, a subordinate patrol major who investi-
gated the conduct of and recommended the demotion of a captain, for vi-
olating the captain's First Amendment right of association); *Saye v. St.
Vrain Valley Sch. Dist. RE–1J*, 785 F.2d 862 (10th Cir. 1986) (reversing di-
rected verdict for defendant school district *and defendant principal* in § 1983
retaliation action brought by teacher because she presented evidence that

insulated from individual liability under § 1983 so long as Taylor can prove that Ernst's discriminatory motive was a factor in bringing about his termination. See *id.* Taylor has presented just such evidence: evidence of Ernst's racial animus toward Taylor and evidence of Ernst's significant role in the investigative and disciplinary proceedings that brought about Taylor's termination.

Ernst emphasizes his "subordinate" role, but that cannot defeat the cat's paw theory, which assumes from the beginning the (alleged) bad actor's subordinate role. That's the whole point: someone who is not the final decision-maker causes the termination or other adverse action for an unlawful motive by manipulating the final decision. Ernst has not cited any authority that would support limiting application of the well-established cat's paw theory to any particular levels in employers' hierarchical organizations, and we see no reason to do so.

---

principal had recommended her non-renewal in retaliation for her union participation, that the superintendent "relied on [the principal's] recommendation to a substantial extent in presenting the matter to the School Board," and that "School Board members … relied completely on the recommendations of the administration in voting not to renew" plaintiff's contract); and *Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) (upholding liability under § 1983 of college president who recommended discharge of faculty members in retaliation for First Amendment activity where board of trustees followed that recommendation, and holding that "[i]t is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate step[s] in the chain of causation do not necessarily defeat the plaintiff's claim") (internal quotation marks omitted).

"Unmistakable evidence of racial animus," such as a defendant's use of racial epithets or slurs, makes for a "simple analysis." *LaRiviere v. Bd. of Trustees of Southern Illinois Univ.*, 926 F.3d 356, 359 (7th Cir. 2019); see also *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) ("Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision[.]"). Taylor has presented testimony from OPR Investigator George Avet that Ernst used racial slurs against Taylor at multiple points during the 2011 OPR investigation into the shooting incident. Further, Taylor testified that prior to the February 2013 Merit Board hearing, Ernst used a racial slur while telling Taylor to quit his job. This is "unmistakable" evidence—which we must credit at this stage of the case—of Ernst's intent to discriminate and indeed makes for a simple analysis.

Taylor has also presented sufficient evidence that Ernst played a key role in the investigative and administrative proceedings that led to his termination. Let's start with the obvious. In March 2011, Ernst was the senior and lead investigator assigned to the OPR investigation of the shooting incident. He drafted and obtained the warrant to search Taylor's residence and vehicle and authored the Report of Investigation, which Ways and Whittler reviewed as part of the disciplinary process.

As author of the Report, Ernst decided what evidence was presented and what evidence was left out or simply left uninvestigated. We are particularly concerned by Johnson's opinion that any shots fired from the third-floor window of Taylor's residence could not have damaged the headlights and windshield of Wolfe's truck because the rear end of the truck

was facing that window at the time of the shooting. If this is true, Woolfolk's account of the shooting and the results of Ernst's subsequent investigation are at odds with reality.

When we combine these two strands of evidence—Ernst's racial animus and his extensive involvement in Taylor's termination—the case turns on genuine issues of material fact. A reasonable juror might conclude that Ernst did not like Taylor because of his race and deliberately slanted the OPR investigation to force him out of the Sheriff's Office. A reasonable juror could also accept Ernst's explanation that he in fact harbored no racial animus and that the events and charges underlying his investigation and Report provide a sound non-discriminatory reason for recommending termination. The dispute precludes summary judgment for Ernst.

Ernst's second argument is based on the undisputed facts showing that he had probable cause to arrest Taylor on March 9, 2011 based on Woolfolk's and Wolfe's statements as witnesses. He cites our line of precedents holding that a police officer does not violate the Fourth Amendment by arresting a person if she has probable cause for the arrest, and that an officer with probable cause ordinarily may proceed with an arrest without further investigating potentially exculpatory evidence. See, e.g., *Matthews v. City of East St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012) ("[O]nce an officer has probable cause, he need not seek out exculpatory evidence. Here, probable cause was established by [the witness's statement], therefore [the officer] need not continue to investigate."); *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (collecting cases supporting proposition that "complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead

a reasonable officer to be suspicious, in which case the officer has a further duty to investigate").

This line of precedents does not apply to Taylor's equal protection claim about his allegedly race-based termination. A patrol officer is not a judge. Once she has probable cause to arrest, the Fourth Amendment allows her to make the arrest and leave it to others in the criminal justice system to sort out conflicting evidence. The situation here is entirely different. Taylor is not challenging his arrest. He is challenging his termination. Ernst took the lead in an investigation that continued for weeks after Taylor's arrest, and Ernst's involvement in the case continued for years, at least through the Merit Board hearing in 2013. If his racial animus toward Taylor led him to conceal or turn a blind eye to exculpatory evidence during that longer investigation, and if his actions caused Taylor's termination, the Equal Protection Clause reaches such actions. See *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 565 (7th Cir. 2019) ("It is well-established that terminating an employee on the basis of his protected status—including race or national origin—violates the Equal Protection Clause of the Fourteenth Amendment."); cf. *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (reversing summary judgment for Postal Service on plaintiff's Title VII claim of race discrimination where evidence of selective enforcement of discipline created material fact dispute as to whether Postal Service's stated reason for terminating plaintiff was pretextual).

2. *Step Two: Clearly Established Law in 2011 and 2013*

Under the facts asserted by Taylor and relied upon by the district court, Ernst violated clearly established law. "A right is clearly established when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Hernandez v. Foster*, 657 F.3d 463, 473–74 (7th Cir. 2011) (cleaned up), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In 2011 and 2013, when the events took place, it was clearly established that a government official violates the Equal Protection Clause of the Fourteenth Amendment by using his official powers to cause a colleague to be fired on the basis of race. See *de Lima Silva*, 917 F.3d at 565.

Any reasonable official in Ernst's position would have known that intentional racial discrimination toward another employee was unconstitutional. And what Taylor alleges against Ernst is textbook racial discrimination. The word "n****r," used by Ernst, a white man, aimed at Taylor on several separate occasions, reflects a uniquely virulent strain of racism, long recognized by the federal courts as capable of having a "highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004); cf. *Virginia v. Black*, 538 U.S. 343, 354–55 (2003) (noting association of the word "n****r" with Ku Klux Klan's campaign of racial violence and intimidation).

The illegality of Ernst's alleged conduct was obvious long before these events in 2011 and 2013. In *Auriemma v. Rice*, for example, we said that any "police chief who thought he could demote and promote only along allegedly clear racial lines could not be a reasonable police chief." 910 F.2d 1449, 1457 (7th Cir. 1990) (en banc). In *Auriemma*, eighteen white Chicago police officers alleged that they were demoted by a black former police superintendent on account of their race. *Id.* at 1451. In determining the second step of the qualified immunity

analysis, whether the constitutional right allegedly violated was clearly established in the 1980s, we explained that the kind of racial discrimination alleged by the white officers—*intentional* racial discrimination—"ha[d] not just recently been found to be unsupportable." *Id.* at 1455; see also *Mohr v. Chicago Sch. Reform Bd. of Trs.*, 99 F. Supp. 2d 934, 940 (N.D. Ill. 2000) ("[A]ny reasonable administrator would know that intentional racism was illegal[.]").

Ernst, however, argues that the second prong of the qualified immunity inquiry requires precedent tied to more particularized facts. He argues that the district court incorrectly denied qualified immunity based on the "broad principle that terminating an employee on the basis of his race violates equal protection." According to Ernst, in 2011 and 2013, it was not clearly established that a *subordinate employee could be held liable* for unlawful efforts to cause the termination of another employee.

Ernst's argument asks the wrong question about qualified immunity. The question is not whether *rules of individual liability* for the conduct were clearly established at the time. The question is whether *the wrongfulness of the defendant's conduct* was clearly established. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (in deciding immunity, "the focus is on his conduct, not on whether that conduct gave rise to a tort in a particular case"). The Supreme Court has repeatedly described the defense of qualified immunity in terms of whether the defendant official's

"actions" or "conduct" violated clearly established law, not in terms of whether a defendant should have realized he would be held civilly liable for his actions or conduct. E.g., *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("conduct"); *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) ("conduct"); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) ("actions"); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) ("actions"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("conduct").

By 2011, a veritable river of precedents established that public employees may not discriminate against other employees on the basis of race. E.g., *Pilditch v. Bd. of Educ. of City of Chicago*, 3 F.3d 1113, 1116 (7th Cir. 1993) (intentional reverse racial discrimination by black city council members against white principal would violate Equal Protection Clause); *Auriemma*, 910 F.2d at 1455 (emphasizing that intentional discrimination alleged against white officers "ha[d] not just recently been found to be unsupportable"); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 624 (7th Cir. 1986) (where plaintiff alleged racial discrimination by police academy supervisors, we reiterated that "the Fourteenth Amendment … grant[s] 'public sector employees independent rights to be free of employment discrimination'"), quoting *Trigg v. Fort Wayne Cmty. Schs.*, 766 F.2d 299, 302 (7th Cir. 1985); see also *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); *Hunt v. City of Markham*, 219 F.3d 649, 652, 655 (7th Cir. 2000) (statements by black mayor reflecting racial animus toward constructively discharged white police officers were evidence of impermissible discrimination in violation of 42 U.S.C. § 1981).

Based on the district court's analysis of the summary judgment evidence, we must assume here that Ernst acted out of racial animus and that his actions caused Taylor's termination. Any reasonable public employee, and certainly any public employee responsible for investigating other employees for disciplinary purposes, would have known he could not act on the basis of racial animus. Ernst simply has not offered a plausible argument to the effect that a reasonable police officer in 2011 could have thought he could engineer a colleague's termination because of his race without violating the Constitution.

In addition, while precedent tied to particularized facts can indicate that a point of law is clearly established, the Supreme Court does not demand a case directly on point. *Thompson v. Cope*, 900 F.3d 414, 422 (7th Cir. 2018); see also *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (reiterating that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question"), quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There "can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018), quoting *Brosseau v. Hagen*, 543 U.S. 194, 199 (2004); see also *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000) ("In some rare cases, where the constitutional violation is patently obvious, the plaintiff may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated."); *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008–09 (9th Cir. 2010) (because non-discrimination principle in equal protection cases is "so clear," there does not need to be a prior

case with materially similar facts for a right to be clearly established). If the cited cases on race discrimination in public employment decisions were not enough, the facts we must assume would qualify this case as that rare, obvious case. Based on the wealth of case law on the unlawfulness of race discrimination in the employment context, Ernst had "fair and clear warning" in 2011 and 2013 that he was violating the Constitution. *Thompson*, 900 F.3d at 422, quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017). We therefore affirm denial of summary judgment for Ernst.[5]

III. *The Appeal of Ways and Whittler*

   A.  *Scope of Appellate Jurisdiction*

Whether Ways and Whittler are entitled to qualified immunity also turns on a question of law, and we have jurisdiction over their appeal. Unlike Ernst's appeal, Ways and Whittler's core argument does not rely on disputed issues of fact.

Ways and Whittler argue that they were "innocent officials" who lacked knowledge of Ernst's discriminatory purpose. Their respective termination recommendations, then, were not based on Taylor's race. This argument, despite Taylor's protests, does not rely on the many disputed facts.

---

[5] We disagree with Taylor's arguments that Ernst waived some of the arguments he makes on appeal. While his arguments on appeal have shifted, they have done so in response to the district court's reasoning. In effect, the district court "opened the door" to Ernst's argument on appeal by denying qualified immunity on a basis not clearly presented by the parties' arguments in the district court. See *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1194 (7th Cir. 1992). A "party may attack the legal theory on which the district court based its decision," and that is precisely what Ernst has done on appeal. *Id.*, citing *Hedge v. County of Tippecanoe*, 890 F.2d 4, 8 (7th Cir. 1989), and *Toney v. Burris*, 829 F.2d 622, 626–27 (7th Cir. 1987).

Taylor, for example, disputes the conclusions underlying Ernst's Report. He denies firing a BB gun at either Woolfolk or Wolfe's truck. He denies failing to report his 1999 DUI arrest and conviction to the Sheriff's Office. And he argues that termination was "extraordinarily severe" as compared to discipline in similar cases with other Sheriff's Office personnel. But none of Taylor's disputed facts—including his denial of the underlying misconduct—have any bearing on Ways and Whittler's principal defense, which is that they bore no racial animus of their own and lacked knowledge of Ernst's racial animus toward Taylor.

Taylor also argues that the material facts of Ways' and Whittler's respective roles in his termination are disputed. Most significantly, he argues that whether Ernst had any influence over Ways' and Whittler's respective termination recommendations, whether Whittler merely rubber-stamped Ernst's Report, and whether Ways or Whittler attempted to corroborate the results of the OPR investigation remain in dispute. These factual disputes may be important for Taylor's Title VII claim against the Sheriff's Office as an employer, but liability on a § 1983 equal protection claim is decided one person at a time. E.g., *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017). These disputes are not material to the individual claims against Ways and Whittler. And that is the crux of Ways and Whittler's argument: that they are entitled to qualified immunity unless Taylor has evidence that they (i) were themselves motivated by race; (ii) knew of Ernst's racial animus and did nothing about it; or (iii) turned a blind eye to

warnings of Ernst's racial animus. In sum, their argument is a legal question that we may consider here.[6]

B.  *Merits of Qualified Immunity for Ways and Whittler*

For constitutional violations under § 1983, "a government official 'is only liable for his or her own misconduct.'" *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). There is no such thing as *respondeat superior* liability for government officials under § 1983. E.g., *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). The supervisor is therefore liable only if she was personally involved in the constitutional violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). Personal involvement in a subordinate's constitutional violation requires supervisors to "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Matthews*, 675 F.3d at 708, quoting *Jones*, 856 F.2d at 992–93; see also *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (stating same). Put another way, personal involvement in the equal protection context requires specific intent to discriminate. *Locke*, 788 F.3d at 669.

The facts of the often-cited *Ashcroft v. Iqbal* illustrate this point. Javaid Iqbal, a Pakistani Muslim, was arrested and detained by federal officials in the wake of the 9/11 terrorist attacks. He alleged that he was deprived of several constitutional protections while in federal custody. 556 U.S. at 666. Iqbal named several federal officials as defendants, including correctional officers with whom he had day-to-day contact,

---

[6] Taylor argues that Ways and Whittler also waived some of the arguments they raise on appeal. We disagree. Ways and Whittler sufficiently raised their "innocent official" defense in the district court.

prison wardens, and most notably, then-Attorney General John Ashcroft and then-Director of the FBI Robert Mueller. *Id.* at 666, 668.

Iqbal alleged that his jailors "kicked him in the stomach, punched him in the face, and dragged him across his cell without justification, subjected him to serial strip and body-cavity searches," and refused to let him pray because there would be "[n]o prayers for terrorists." *Id.* at 668 (cleaned up). As to Ashcroft and Mueller, however, Iqbal alleged only that they adopted an unconstitutional policy that subjected "high-interest" detainees such as himself to harsh conditions of confinement based on race, religion, or national origin. *Id.* at 667–69. Iqbal alleged that Ashcroft was the "principal architect" of the unconstitutional policy, while Mueller was "instrumental in [its] adoption, promulgation, and implementation." *Id.* at 669.

The Supreme Court explained that while Iqbal's account of his prison conditions, could, if proved, demonstrate constitutional violations by *some* governmental actors, he had not plausibly alleged that Ashcroft and Mueller were personally involved in those violations. *Id.* at 668–69, 682–83. Iqbal's complaint was devoid of factual allegations that plausibly suggested discriminatory intent on the part of Ashcroft or Mueller. *Id.* at 683. So, even accepting the truth of the allegation that Ashcroft and Mueller had adopted the restrictive confinement policy for post-9/11 detainees, that allegation did not support a plausible claim of purposeful discrimination on account of race, religion, or national origin. *Id.* On the facts alleged by Iqbal, the arrests engineered by Ashcroft and overseen by Mueller were "likely lawful and justified by [a] non-discriminatory intent to detain aliens who were illegally

present in the United States and who had potential connections to those who committed terrorist acts." *Id.* at 682.[7]

For Ways and Whittler to be held liable for racial discrimination, then, Taylor needed to offer evidence that they acted on the basis of his race. See *Iqbal*, 556 U.S. at 683; *Locke*, 788 F.3d at 669. They need not have participated directly in the constitutional deprivation, but the allegations must amount to more than vicarious liability for Ernst's unlawful actions. See, e.g., *Carmody*, 893 F.3d at 403. Taylor's evidence falls short.

---

[7] Several recent examples from this circuit illustrate *Iqbal*'s core teaching: that a plaintiff must allege *direct* liability to maintain an individual claim under § 1983. In *Locke v. Haessig*, we held that evidence of a defendant supervisor's retaliation against plaintiff for reporting sexual harassment, when combined with evidence of failure to intervene or investigate plaintiff's claims of sexual harassment, was enough to support an inference of an intent to discriminate. 788 F.3d at 671–72. Critically, plaintiff offered evidence that tended to show that the supervisor's response to his complaints amounted to more than mere inaction. *Id*. Conversely, in *Gill v. City of Milwaukee*, the plaintiff failed to allege that the defendant police chief either knew about or was personally involved in the Fifth and Fourteenth Amendment violations alleged against two detectives under his supervision. 850 F.3d at 344. The complaint alleged that the police chief failed to train the detectives adequately and was "deliberately and recklessly indifferent" to their conduct. *Id.* This was not enough to maintain a claim for individual liability under § 1983. *Id.*; see also *Carmody v. Bd. of Trs. of Univ. of Illinois*, 893 F.3d 397, 403 (7th Cir. 2018) (summary judgment appropriate where plaintiff's arguments in favor of individual liability under § 1983 for university president and associate provost amounted to *respondeat superior* liability); *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly.").

In denying these defendants' motion for summary judgment, the district court emphasized their respective roles as *nearly* final decision-makers. Ways, the court noted, sustained the charges and termination recommendation against Taylor, and Whittler both concurred with the termination recommendation and served as the final signature on the Ernst-led OPR investigation. Analogizing this case to *de Lima Silva v. Department of Corrections*, 917 F.3d 546 (7th Cir. 2019), the district court concluded that Ways and Whittler were not entitled to qualified immunity.

We disagree with the district court's analysis for two reasons. First, the district court relied on evidence that Ways and Whittler played key roles in approving Ernst's termination, which does not seem to be in dispute. That evidence does not signal, however, that either Ways or Whittler harbored any racial animus against Taylor or anyone else, or that they knew or suspected that Ernst was motivated by race. Indeed, when asked during oral argument to identify the "best evidence" that Ways and/or Whittler knew of Ernst's bias, Taylor's attorney responded that "they knew of the deficiencies in the investigation—or at least Whittler did." An allegation that the supervisor had knowledge of a deficiency is not, without more, enough to maintain an individual liability claim under § 1983. See *Horshaw*, 910 F.3d at 1029; *Carmody*, 893 F.3d at 403.

Second, the district court's reliance on *de Lima Silva* is inapposite. The plaintiff was a Latino correctional sergeant whose use of force on an inmate triggered an internal review process that ultimately led to his termination. 917 F.3d at 551. In response, de Lima Silva sued Warden Quala Champagne under § 1983 for violating the Equal Protection Clause. The district court granted summary judgment in favor of Warden

Champagne, but we reversed, finding that de Lima Silva had provided sufficient evidence from which a reasonable jury could infer Warden Champagne was personally involved in de Lima Silva's constitutional deprivation, his termination on the basis of race. See *id.* at 559–64.

Warden Champagne was much more involved with de Lima Silva's case than Ways and Whittler were in Taylor's case. Warden Champagne ordered the initial personnel investigation into de Lima Silva (as was her custom) and assigned two superintendents to conduct the investigation. *Id.* at 553–54. She requested an independent "Use of Force Review" and served on two of the three committees administering discipline in de Lima Silva's case. *Id.* at 554–55. Finally, as the appointing authority, she was the sole final decision-maker for the discipline—if any—ultimately imposed on de Lima Silva. *Id.* at 556. This evidence of her unmistakable influence at nearly every level of the investigative process, combined with other evidence that the charges against de Lima Silva were pretextual (and that the warden knew the charges were pretextual), was sufficient to defeat summary judgment on the issue of personal involvement. *Id.* at 562–63.[8]

Taylor has not presented comparable evidence showing that Ways and/or Whittler were similarly involved at each level of the investigation and the discipline process. On

---

[8] De Lima Silva offered evidence that Warden Champagne's reasons for discharging him had shifted over time and that the latest explanation—that de Lima Silva's use of force was more serious than that of a white correctional sergeant who had received a one-day suspension—first surfaced at summary judgment. 917 F.3d at 556–57, 562–63. We also found that a jury could deem Warden Champagne's stated rationale to be pretextual. *Id.* at 563–64.

appeal, Taylor argues that Ways and Whittler failed to conduct meaningful reviews of the entire OPR file involving the shooting and DUI incidents, that they failed to investigate independently the information provided by Ernst, and that Chief Holbrook identified weaknesses in Ernst's investigation to Whittler and she still declined to investigate them. This evidence and these arguments may be highly relevant to Taylor's cat's paw Title VII claim, and they may show that Ways and Whittler did not perform well in Taylor's case. But none of these arguments or evidence supports a reasonable inference that they acted on the basis of race, as needed to prove they violated the Equal Protection Clause.

Because Taylor has failed to present evidence of Ways' or Whittler's personal involvement in his alleged constitutional deprivation, we need not reach the second prong of the qualified immunity inquiry. We reverse the district court's denial of qualified immunity with respect to Ways and Whittler.

The denial of summary judgment on Ways' and Whittler's qualified immunity defense in No. 20-1410 is REVERSED, and the denial of summary judgment on Ernst's qualified immunity defense in No. 20-1411 is AFFIRMED. The case is remanded to the district court for further proceedings consistent with this opinion.